IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | No. 09-245 |
| PHILLIP PARROTT : | |

**SURRICK, J.**                                                                                                **NOVEMBER 20, 2009**

### MEMORANDUM

Presently before the Court is Defendant Phillip Parrott's Motion to Suppress Physical Evidence. (Doc. No. 23.) A suppression hearing was held on October 26, 2009. For the following reasons, Defendant's Motion was denied on November 18, 2009. (Doc. No. 41.).

**I. BACKGROUND**

On April 14, 2009, a grand jury returned an indictment charging Defendant, Phillip Parrott, with a single count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. No. 10.) On September 16, 2009, Defendant filed the instant Motion seeking to suppress the shotgun recovered by the police at the time of his arrest. (Doc. No. 23.) The Government filed an Opposition to Defendant's Motion. (Doc. No. 29.) At the suppression hearing on October 26, 2009, the sole testifying witness was Officer Janeen Jones, of the Philadelphia Police Department. Officer Jones conducted the search that resulted in the seizure of the shotgun.

**II. FINDINGS OF FACT**

In the early morning hours of November 30, 2009, Officer Jones and her partner were in a marked police car patrolling the streets of the City of Philadelphia. (Hr'g Tr. 5-6, 26, Oct. 26,

2009.)  At approximately 1:30 a.m., they received a call over the police radio about an individual with a gun in the 3600 block of North Bouvier Street.  (*Id.* at 6-7.)  While en route to investigate, they received another radio call about shots being fired at the same location.  (*Id.*)  After turning onto the 3600 block of North Bouvier Street, Jones saw Defendant standing next to the last house on the block at the corner of Bouvier and Pacific Streets.  (*Id.* at 7-8.)  The street was well illuminated by the streetlights and Defendant was holding "a long dark object in his hand."  (*Id.* at 9.)  As the officers approached Defendant, Jones saw that Defendant was holding a gun, which Jones's partner recognized as a shotgun.  (*Id.* at 10-11, 31.)   Jones's partner, who was driving, stopped the car about 20 to 30 feet from Defendant and both officers exited the car.  (*Id.* at 8-9.)  The Officers drew their guns and then yelled at Defendant to drop his weapon and put his hands up.  (*Id.* at 11, 35-36.)  Defendant turned and ran into the house in front of which he was standing.  (*Id.* at 11.)  At this point, based on the information available to them, the officers had probable cause to arrest Defendant for carrying a firearm on a public street in Philadelphia in violation of 18 Pa. Cons. Stat. § 6108.  *See United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002) (noting that probable cause for an arrest exists when "reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested"); *see also United States. v. Bond*, 173 F. App'x 144, 146 (3d Cir. 2006) (analyzing decisions of Pennsylvania courts pertaining to 18 Pa. Cons. Stat. § 6108 and concluding that officers had probable cause to arrest the defendant after observing him with a gun on a Philadelphia street).

Out of concern for their safety, Jones and her partner did not follow Defendant into the

house. (*Id.* at 14.) Jones had prior experience in responding to calls concerning individuals with guns and in entering houses, and she and her partner were concerned that Defendant "could be standing right behind the door waiting for [them] to attempt to kick the door in and shoot [them]." (*Id.* at 14.) Jones and her partner set up a perimeter around the house to ensure that Defendant did not flee from the house with the gun, and they waited for backup to arrive. (*Id.* at 14-15.)

As other officers began arriving on the scene, a female leaned out of a window of the house, asking about the cause of the commotion. (*Id.* at 15.) Jones and her partner repeatedly requested that the woman open the front door and tell them where the man with the gun was, but the woman at first denied that anyone had entered the house and later stated that the man had run out the back door. (*Id.* at 16.) The Officers had not seen anyone exit the rear of the house. (*Id.*) Shortly thereafter, the woman opened the front door, and three adults and a number of juveniles came out. (*Id.* at 16-17, 44.) Defendant was not one of those exiting the home. (*Id.* at 17.) None of the people exiting the house had a gun. (*Id.*) The woman with whom Jones had conversed through the window was one of the people who came out of the house, and she told Jones that nobody else was in the house. (*Id.* at 18.)

About five minutes later, as the officers were attempting to ascertain if anyone remained in the house, Defendant came to the top of the internal staircase between the first and second floors, which was visible from the front door. (*Id.* at 19, 45.) He stated that he had been in bed and asked what was going on. (*Id.* at 19.) As he started coming down the stairs, officers approached him and led him out of the house. (*Id.* at 19.) Jones identified Defendant as the man that she had seen earlier with the gun and Defendant was arrested and placed in handcuffs. (*Id.*)

At this point, Jones, along with other officers, entered the house. (*Id.* at 21.) They did not have a search warrant. (*Id.*) It would have taken several hours to obtain one. (*Id.*) The police were not sure what they were dealing with and they had a number of concerns based on their observations of Defendant and his actions, the radio report of shots having been fired at this location, and the fact that the gun was still inside the house. (*Id.* at 21-22.) Their concerns were heightened by the false statements made by the woman at the window that nobody had entered the house, that the gunman had run out the back, and that nobody remained inside after she had come outside with the others. (*Id.* at 20-21) The officers did not know if there had been a home invasion, whether there was an injured person in the house, or whether there was someone in the house with the shotgun. (*Id.* at 17-18, 21.)

Once inside the house, Jones cleared the first floor, making sure that there was nobody hurt or hiding there. (*Id.* at 23.) She then proceeded to the basement. (*Id.*) While clearing the basement, her foot inadvertently struck an object that was underneath a blanket on the floor. (*Id.*) The heavy metallic sound that the object made on the concrete floor, along with its weight, led Jones to believe that this was the gun that Defendant had been holding earlier outside the house. (*Id.* at 23-24.) The sound that the gun made on the concrete was a sound she had heard previously in her experience as a police officer. (*Id.*) To avoid accidently firing it, Jones did not grab the object. (*Id.* at 24.) Rather, she lifted the blanket. (*Id.*) The gun that Defendant had been holding when he ran into the house was under the blanket. (*Id.* at 24-25.)[1]

III. **CONCLUSIONS OF LAW**

The Fourth Amendment "protects people in their homes from unreasonable searches and

---

[1] Officer Jones was a credible witness.

4

seizures by permitting only a neutral and detached magistrate to review evidence and draw inferences to support the issuance of a search warrant." *United States v. Coles*, 437 F.3d 361 (3d. Cir. 2006) (citing *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Defendant asserts that the police had no probable cause or lawful justification to search the house on North Bouvier Street without a warrant. (Doc. No. 23 at 1.) According to Defendant, the search did not satisfy the requirements of the search-incident-to-arrest doctrine, as defined in *Chimel v. California*, 395 U.S. 752 (1969), and the circumstances of the search fell outside the bounds of a limited protective sweep. (*Id.* at 4-5.) The Government argues that the search was lawful under both the exigent circumstances and protective sweep exceptions to the warrant requirement, and the seizure of the shotgun was proper under the plain view doctrine. (Doc. No. 29 at 2.)[2]

### A. Exigent Circumstances Exception

A warrantless search or seizure inside a home is "presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." *Coles*, 437 F.3d at 365 (citing cases). *Cf. United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.1973) ("Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant."). In the context of the Fourth Amendment, "exigent circumstances"

---

[2] In its brief, the Government also argued that Defendant lacks standing to assert a Fourth Amendment violation due to the circumstances of the search. (Doc. No. 29 at 3-4.) At the suppression hearing, the Government conceded that Defendant has standing. (Hr'g Tr. at 3–4.)

5

are circumstances in which "the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Coles*, 437 F.3d at 366 (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967)). "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *Id.* (citing *United States v. Richard*, 994 F.2d 244, 247-48 (5th Cir. 1993). Defendant does not allege, and the facts do not indicate, that the Government created the exigency on which it now relies to justify the search. *See id.* (noting that exigent circumstances do not justify a warrantless search when the Government's own actions deliberately created those circumstances).

The Government contends that the officers had probable cause to believe that the shotgun was inside the house, since the officers saw Defendant bring the weapon into the house and they did not see anyone leave the house with the weapon. (Doc. No. 29 at 5.) According to the Government, exigent circumstances included a possibility that an unknown number of individuals remained inside the house; that individuals inside the house had access to the Defendant's shotgun or other weapons, thus posing a danger to the officers or civilians, especially in view of shots having been fired earlier; and that individuals remaining in the house might attempt to hide the shotgun or remove it from the house. (*Id.* at 5-7.) In view of Defendant's behavior and the call about shots having been fired, the officers also had reason to believe that they might be dealing with a home invasion, and that there could be injured people inside the house in need of medical attention. (*Id.* at 10 n.2; Hr'g Tr. at 21.)

It would have taken the officers on the scene several hours to obtain a search warrant for

the house, and while that course of action would have been appropriate in other circumstances, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Hayden*, 387 U.S. at 298-99. The Supreme Court's analysis in *Hayden* is instructive: "[s]peed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." *Id.* at 299. In addition to the concerns highlighted by the Court in *Hayden*, the possibility that someone inside the house might be injured and in need of medical attention was an exigency that justified the officers' warrantless entry so as to ensure the wellbeing of all involved. In sum, there were exigent circumstances here to justify the search in the absence of a warrant.

### B. Protective Sweep Exception

The Government also contends, in the alternative, that the search of the house was permissible without a warrant because it was a protective sweep. (Doc. No. 29 at 8.) The Third Circuit has observed:

> The Supreme Court has recognized that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" The same danger can arise from arresting a suspect just outside a home. In striking a balance with the privacy interests of the Fourth Amendment, the protective sweep doctrine allows "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."

*United States v. Foley*, 218 F. App'x 139, 143 (3d Cir. 2007) (quoting *Maryland v. Buie*, 494 U.S. 325, 327, 333 (1990)) (citations omitted). The police may conduct a limited protective sweep without a search warrant "when the searching officer possesses a reasonable belief based

7

on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337.

The Government's argument under the "protective sweep" theory relies principally on the same facts that underlie its "exigent circumstances" argument. We are satisfied that the exigent circumstances analyzed above justified the need of the police to conduct a protective sweep. One of the factors underlying the officers' need to search the house was to ensure that none of Defendant's confederates were still inside the house, where they would have access to the shotgun that remained inside. This posed a risk to the police outside and a risk that evidence might be disposed of. Another factor was the possibility that there were injured individuals inside in need of medical assistance. These concerns were reasonable and were based on the conduct of Defendant, the conduct of other individuals on the scene, and the officers' experience. The circumstances warranted a limited protective sweep of the house without a search warrant.

Defendant contends that he "was outside of the home when he was taken into custody and no occupants were known to be left inside the house." (Doc. No. 23 at 4-5.) Whether Defendant was taken into custody inside the house or as soon as he was brought outside is of no import here. The police had reason to believe that the gun was in the house and that additional individuals—whether accomplices or victims—might also be inside the house, based on the number of people who walked out in the first place and the several false statements by one of the women in the house.

**C.    Plain View Doctrine**

The Government argues under its "protective sweep" theory that Jones's discovery of the shotgun was proper under the plain view doctrine. (Doc. No. 29 at 10-11.) Whether the search

of the house was justified by exigent circumstances or was a limited protective sweep, Jones seizure of the shotgun was proper under the plain view doctrine.

The plain view doctrine "provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Texas v. Brown*, 460 U.S. 730, 738 (1983). The Supreme Court has characterized it as "an extension of whatever the prior justification for an officer's 'access to an object' may be," rather than an independent exception to the warrant requirement. *Id.* at 738-39. The plain view doctrine reflects the rule that "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Id.* at 739.

"[C]ourts have logically extended this [doctrine] to permit the admission of evidence discovered with other sensory faculties," resulting in "plain smell," "plain hearing," and "plain feel" applications of the doctrine's core principles. *See United States v. Yamba*, 506 F.3d 251 (3d Cir. 2007) (citing cases). In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), a plurality of the Supreme Court held that a warrantless seizure of an object is permissible under the plain view doctrine if three conditions are satisfied:

> First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Brown*, 460 U.S. at 736-37 (quoting *Coolidge*, 403 U.S. 443 *passim*) (citations omitted). Applying the plain view doctrine to the instant facts, the search of the house was justified by

9

exigent circumstances and as a protective sweep, as discussed above. The first prong of the *Coolidge* test is satisfied.

As for the inadvertent nature of Jones's discovery of the shotgun, Jones credibly testified that she accidentally came in contact with the blanket and the gun underneath it as she was performing a search of the basement. "[A]n inadvertent discovery [is] the cornerstone of the entire [plain view] doctrine." *United States v. Baranek*, 903 F.2d 1068, 1071 (6th Cir. 1990) (describing the plain view doctrine as being "designed to deal with 'inadvertence'"). Jones testified that she was clearing the basement, trying to make sure that there was nobody there, "very focused on looking straight ahead, looking any [sic] nook and cranny where somebody could be hiding." (Hr'g Tr. at 49.) While systematically moving from left to right, she "hit [the blanket] with the side of [her] foot, as [she] was shuffling around, clearing." (*Id.* at 49-50.) When Jones kicked the blanket, she did so inadvertently.

As for the "immediately apparent" requirement, the *Brown* Court clarified that the proper standard to apply is the probable cause standard. *Brown*, 460 U.S. at 741-42 (explaining "that '[t]he seizure of property in plain view . . . is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity'" (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)) (emphasis omitted)). Rather than actual knowledge, the probable cause standard "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Id.* at 742 ("A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required."). When Jones's foot hit the blanket, an object under

10

the blanket came in contact with the concrete basement floor and made a "heavy, metallic sound." (Hr'g Tr. at 23.) In Jones's experience, that sound was consistent with the sound of a gun hitting concrete. (*Id.* at 23-24, 50-51.) When she heard that sound, Jones had probable cause to believe that the shotgun that Defendant had in his hand when he fled into the house was under the blanket. (*Id.* at 24.)

Defendant argues that the circumstances did not justify the warrantless search under the search-incident-to-arrest doctrine. (Doc. No. 23 at 4.) However, the Government does not rely on that doctrine. The entry of Officer Jones into the house was justified under both the exigent circumstances and protective sweep exceptions to the Fourth Amendment's warrant requirement. The seizure of the shotgun was proper under the plain view doctrine. Defendant's constitutional rights were not violated.

IV. CONCLUSION

For these reasons, Defendant's Motion was denied by Order dated November 18, 2009. (Doc. No. 41.)

BY THE COURT:

_____
R. Barclay Surrick, J.